Filed 12/30/20  Adir International v. The Travelers Indemnity CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ADIR INTERNATIONAL, LLC,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>THE TRAVELERS INDEMNITY CO.,<br><br>    Defendant and Appellant. | B293415<br><br>(Los Angeles County<br>Super. Ct. No. BC575513) |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa Hart Cole, Judge.  Affirmed.

Gordon & Rees, Asim K. Desai, Margaret M. Drugan; Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Blaine H. Evanson, and Samuel Eckman for Defendant and Appellant.

Klapach & Klapach and Joseph S. Klapach for Plaintiff and Respondent.

————————————

# INTRODUCTION

The Travelers Indemnity Co. appeals from an order granting a motion for reconsideration and declaring arbitration provisions unenforceable and void. Travelers argues the trial court did not have jurisdiction under Code of Civil Procedure section 1008, subdivision (b), to reconsider its prior ruling because case law cited in the motion was not "new" law. Travelers also argues the trial court erred in ruling that the Insurance Code required Travelers to file the arbitration provisions with the Insurance Commissioner (Commissioner) for the arbitration provisions to be effective and that, if California required invalidation of the arbitration provisions, the Federal Arbitration Act (FAA) preempted California law. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

A. *Workers' Compensation Insurance*

    1. *The Policy*

Adir International, LLC operates the Curacao chain of retail department stores. From 2004 to 2011, on eight occasions, Travelers issued a workers' compensation insurance policy (the policy) to Adir.[1] The policy was a "guaranteed cost" policy with standard language approved by the Commissioner.[2] The policy

---

[1]    The policies contained substantially similar terms and conditions.

[2]    According to the Commissioner, "Most California employers receive workers' compensation insurance coverage through guaranteed cost policies. Under a guaranteed cost policy, the insured pays a fixed annual premium for the policy term, regardless of subsequent loss experience. The fixed premium is the sum of the average losses and certain fees. Average losses

contained the rates it would charge Adir. In the policy, Travelers warranted that the policy would apply to a single uniform loss experience rating plan. Before issuing the policy to Adir, in accordance with Insurance Code section 11658,[3] Travelers filed the policy with the Workers' Compensation Insurance Rating Bureau (Rating Bureau) for the Commissioner's review.[4] The Commissioner did not object to the policy.

---

take into account the base rate for each classification assigned to the policy and the employer's experience modification factor. The fees are the estimated costs of providing the insurance; that is sales, underwriting, profit and other fixed costs. Thus, a company with average losses of $500,000, may be charged $750,000 in premium; $500,000 to cover expected loss payments and $250,000 in fees." (*Matter of Adir International, LLC* (Nov. 20, 2018) Cal. Insurance Commissioner, No. AHB-WCA-16-14, pp. 7-8, fn. omitted (*Matter of Adir*).)

[3] Undesignated statutory references are to the Insurance Code.

[4] Section 11658, subdivision (a), provides: "A workers' compensation insurance policy or endorsement shall not be issued by an insurer to any person in this state unless the insurer files a copy of the form or endorsement with the [Rating Bureau] pursuant to subdivision (e) of Section 11750.3 and 30 days have expired from the date the form or endorsement is received by the commissioner from the [Rating Bureau] without notice from the commissioner, unless the commissioner gives written approval of the form or endorsement prior to that time." After performing an initial review, the Rating Bureau transmits the policy or endorsement to the Department of Insurance (Department) for the Commissioner's review. (See § 11750.3, subd. (e); Cal. Code Regs., tit. 10, §§ 2218, 2509.30.)

With regard to dispute resolution, the policy provided, in a section titled "Actions Against Us": "There will be no right of action against us under this insurance unless: . . . The amount you owe has been determined with our consent or by actual trial and final judgment." The policy did not contain an arbitration provision. The policy documents also included a "Policyholder Notice" that contained information regarding sections 11737 and 11753.1. The notice provided that, pursuant to sections 11737 and 11753.1, an insured aggrieved by Travelers' "decision adopting a change in a classification assignment that results in increased premium, or by the application of [Traveler's] rating system to [an insured's] workers' compensation insurance" could send Travelers a written complaint, and if "dissatisfied" with Travelers' decision upon review, an insured may appeal to the Commissioner.

The policy also contained an endorsement titled "Retrospective Rating Plan Premium Endorsement - Large Risk Alternative Rating Option." The Retrospective Rating Plan Endorsement provided: "This endorsement is issued because you chose to have the cost of the insurance rated retrospectively. This endorsement applies only to workers compensation and employers liability insurance when rated under the provisions of the Large Risk Alternative Rating Option that we have negotiated with you." The endorsement did not set forth its premium calculation, definitions, terms, rates, or the parties' obligations under the alternative rating option.[5] The guaranteed

---

[5] As described by the Commissioner, "A retrospective rating plan, or loss sensitive plan, varies the premium an employer will pay based on the employer's actual losses during the coverage period. A minimum program cost, or premium, covers the

4

cost rates were the only rates in the policy.

### 2. *The Unfiled Agreement*

As an annual condition for issuing the policy, Adir executed a separate agreement with Travelers that contained the terms and conditions for the Retrospective Rating Plan Endorsement.[6] The agreement provided that Travelers issued the policy "based upon [Adir's] compliance with the terms and conditions set forth in the [agreement]." Thus, the agreement set forth the manner by which Travelers would retrospectively calculate the premium and other charges for the policy based on Adir's "incurred losses" and "claims handling charges." In addition, the agreement introduced a requirement that Adir post collateral, permitted Travelers to collect attorneys' fees, altered the policy's cancellation terms, and required the binding arbitration of disputes. If the terms of the policy and the agreement conflicted, the agreement's terms prevailed.

Regarding dispute resolution, the agreement stated: "The parties recognize that disputes may arise between them . . . about the parties' rights and duties relative to payment of premium and

---

program's basic costs. The premium then increases linearly with respect to actual losses until it reaches a maximum plateau. A large risk deductible option varies the program calculation even further. Under most workers' compensation insurance policies, the insurer is statutorily obligated to pay an employee's entire claim, from the 'first dollar' to the last. With a large risk deductible plan, the employer agrees to reimburse the insurer for claim costs up to an agreed-upon amount." (*Matter of Adir, supra,* at pp. 10-11, fns. omitted.)

[6]     The terms and conditions of each agreement were substantially the same.

other charges under this Agreement and the Policies.  In addition, disputes may arise regarding whether and how much our claims handling practices (e.g., investigation, administration, payments in connection with any claims under the Policies) may impact the amount of premium and other charges which you may owe to us under this Agreement and the Policies. . . . [I]n the event such a dispute is not resolved, either party shall submit the matter to arbitration and the other party shall be bound by such submission, provided that you shall not submit to arbitration any matter seeking to restrict our right to draw upon the Collateral or which would have the effect of restricting our right to draw upon the Collateral.  [¶] Neither party shall submit to arbitration (i) any coverage disputes which arise under or in connection with claims or suits brought against the Polices . . . .”  The agreement further provided that it was “deemed made in the State of Connecticut and involves interstate commerce.  Accordingly, we and you agree that any arbitration proceeding arising out of or related to this Agreement shall be governed by the [FAA] . . . and, to the extent not inconsistent with the FAA, Connecticut arbitration law.”  Travelers did not file the agreement with the Rating Bureau.

B.    *The Commissioner’s 2011 Notice Regarding Side Agreements*

On February 14, 2011, the Commissioner issued a letter to the Rating Bureau requesting it to “notify its member insurers” that the Commissioner “has prohibited the use of collateral agreements, which is synonymous with the term ‘side-agreement,’ concerning workers’ compensation insurance unless they are attached to the policy.”  The Commissioner further stated that an insurer’s attempted enforcement of unfiled side

6

agreements could constitute a violation of California law.  The Department's letter quoted former California Code of Regulation, title 10, section 2268 (regulation 2268).  Regulation 2268, at that time, provided:  "No collateral agreements modifying the obligation of either the insured or the insurer shall be made unless attached to and made a part of the policy . . . ."[7]

On February 17, 2011, the Rating Bureau issued a notice to its insurer members, including Travelers, stating that the Commissioner was "particularly concerned with arbitration provisions contained in unattached collateral agreements and considers such terms unenforceable unless the insurer can demonstrate that the arbitration agreement was expressly agreed to by the insured at the time the policy was issued."  According to the Commissioner, after Travelers received this notice, Travelers issued the agreement for the final policy year to Adir, and Travelers "knew that continued use of unfiled collateral agreements would constitute a violation of California law." (*Matter of Adir, supra,* at pp. 45-46.)

---

[7]     In 2016, the Department amended regulation 2268 to provide:  "An insurer shall not use a policy form, endorsement form, or ancillary agreement except those filed and approved by the Commissioner in accordance with these regulations."  (Cal. Code Regs., tit. 10, § 2268, subd. (b).)  In addition, the Department amended California Code of Regulations, title 10, section 2250, to define an "[a]ncillary agreement" to include a "dispute resolution agreements."  (Cal. Code Regs., tit. 10, § 2250, subd. (f).)  Unless otherwise stated, all references to regulation 2268 are to the version existing in 2011 when the parties entered into the final policy and agreement.

C. *Forum For the Parties' Premium Dispute*

When Adir's insurance coverage expired on July 1, 2012, Adir did not renew its workers' compensation insurance with Travelers. On August 25, 2014, Travelers sent Adir a letter demanding arbitration pursuant to the agreement. Travelers sought arbitration regarding "the amount of premium currently owing to Travelers by Adir . . . for the period July 1, 2011 to July 1, 2012." On March 13, 2015, Adir filed a complaint in the Los Angeles County Superior Court against Travelers and Adir's insurance broker, Grosslight Insurance, Inc. Based on its workers' compensation insurance, Adir alleged causes of action against Travelers for breach of contract, tortious breach of the covenant of good faith and fair dealing, fraud based on intentional misrepresentation and fraud based on concealment.[8] Adir alleged: "Travelers failed to properly evaluate and set appropriate reserves, failed to resolve claims timely and efficiently, failed to disclose settlement offers/demands that would have otherwise led to the resolution to workers' compensation claims saving [Adir] millions of dollars in fees, costs and expenses, failed to provide sufficient staff to overlook claims, improperly delayed resolution of claims by engaging in a pattern and practice of systematic 'partial body part denials,' and failed to properly audit and evaluate reserves on the workers' compensation claims made against [Adir]." Adir also sought a declaration that the arbitration provisions in the agreement were "void and unenforceable" because the arbitration provisions modified the policy and Travelers failed to file the provisions with

---

[8] Adir dismissed without prejudice a complaint it had filed against Travelers on September 14, 2014.

the Rating Bureau as required by section 11658.

On March 25, 2015, Adir filed a complaint with the Department based on Travelers' practice of using unfiled agreements in connection with its workers' compensation insurance policies. (*Matter of Adir, supra,* at p. 3.) Adir alleged that "Travelers' attempt to compel arbitration under the [agreement] violated Insurance Code sections 11658 and 11750.3." (*Matter of Adir*, at p. 3.) Adir requested that the Commissioner issue an order to show cause and hold a public hearing "to determine whether Travelers should be ordered to cease and desist from enforcing and applying unfiled Side Agreements." (*Ibid.*) On May 13, 2015, the Department issued a letter stating that the agreement, including the arbitration provisions, were "void and unenforceable as they were not filed with the [Department]." However, on June 3, 2015, the Department declined to take action "due to resource constraints. . . ." (*Id.* at p. 4.)

D.   *The Arbitration Proceeds*

1.   *The Trial Court's Ruling*

On May 21, 2015, Adir filed a motion asking the trial court to declare the arbitration provisions in the agreement unenforceable. Adir argued that the Department "has not approved the arbitration clause at issue here, the arbitration provision at issue is contrary to [section 11658] and case law, and is therefore unenforceable." According to Adir, the arbitration provisions "expressly alter[ed] the fundamental terms of the underlying insurance policies" and the arbitration provisions were "void as a matter of law." Travelers argued, "[S]tatutory and legal precedent hold arbitrators resolve challenges based on grounds that affect the entire agreement and courts decide

9

challenges directed specifically at arbitration clauses." Therefore, Travelers argued that the arbitration panel should decide the question of whether the agreement was "void or unenforceable." Travelers also argued the agreement was not subject to section 11658 because it was not a policy form or an endorsement.

On August 21, 2015, the trial court denied Adir's motion without reaching the question of whether the arbitration provisions were enforceable. Rather, the trial court concluded that the arbitration panel should decide Adir's challenge to the arbitration provisions, not the trial court. Citing *Rent-A-Center, West, Inc. v. Jackson* (2010) 561 U.S. 63 (*Rent-A-Center*) and *Preston v. Ferrer* (2008) 552 U.S. 346 (*Preston*), the trial court ruled: "Adir challenges the agreements by arguing they are invalid because they have not been filed with the Insurance Commission[er]. This challenge is to the entire agreements. This challenge is for the arbitrator." In rejecting Adir's argument that application of the FAA would invalidate section 11658, the trial court ruled that section 11658 required insurers to submit policies to the Rating Bureau before issuing the policies and that section 11658 "does not address the issue of whether an arbitrator may decide whether the insurer complied with its requirements."

### 2. *The Arbitration Panel's Ruling*

Adir filed a motion with the arbitration panel maintaining, because the agreement was not "filed or approved by the Insurance Commissioner," the agreement was "an illegal agreement and therefore unenforceable." On May 6, 2016, after finding that Adir challenged the entire agreement and that its challenge was "therefore subject to arbitration," the arbitration

10

panel denied Adir's motion to dismiss Travelers' claims. Ruling that the agreement was "independent" of the insurance policy, the panel found: "The parties never intended that the agreement be considered insurance or that it supplemented in any way the coverage offered Adir and its employees under the policy. The agreement was intended by the parties not to provide insurance or describe insurance coverage but instead it was intended to codify in a written form an agreed-upon formula that would be used [to] calculate the fees and expenses incurred in administering the policy." The panel found that the agreement was not subject to section 11658 because "it [was] not an insurance policy nor an endorsement to an insurance policy."

3.  *The Commissioner's* Shasta Linen *Decision*

On June 22, 2016, the Commissioner, in a precedential administrative decision,[9] concluded that a side agreement executed between the insured and workers' compensation insurer, which "alter[ed] the underlying rates, costs and fees of an insurance policy, as well as choice of law, dispute resolution and cancellation terms," was "illegal under section 11658 and therefore void as a matter of law" because it was not filed with the Rating Bureau. (*Matter of Shasta Linen Supply, Inc.* (June 20, 2016) Cal. Insurance Commissioner, No. AHB-WCA-14-31, pp. 58, 65 (*Matter of Shasta Linen*).) The side agreement provided for binding arbitration of disputes "in the British Virgin

---

[9]     Government Code section 11425.60, subdivision (b), provides that an administrative agency can designate a decision as "precedent" if the decision "contains a significant legal or policy determination of general application that is likely to recur."

11

Islands using Nebraska law." (*Id.* at p. 56.) The side agreement's dispute resolution provisions were "meant to replace those of the [policy]." (*Id.* at p. 57.) The policy did not provide for arbitration and applied California law. (*Id.* at p. 56.) The policy also contained the mandatory notice regarding the resolution of rating disputes under section 11737, subdivision (f). (*Id.* at pp. 12-13.) The Commissioner found that regulation 2268 required the insurer to file "any agreement" that modified or altered the insured's "arbitration obligation." The Commissioner concluded: "[The unfiled agreement] constitutes a collateral agreement modifying the rates and obligations of the insured and the insurer, and is void as a matter of law since it was required to be filed with the [Rating Bureau] and filed with the Department of Insurance before its use in the State of California . . . ." (*Id.* at p. 69.)

### 4. *The Interim Arbitration Award*

The arbitration panel conducted hearings in January, February, and March 2017. On July 20, 2017, the panel issued an interim award of $2,709,280 in favor of Travelers and against Adir. Although the agreement "require[d] each side to bear its own legal fees and costs related to the arbitration," the arbitration panel found: "[T]he [a]greement allows for Travelers to recover attorney's fees and costs expended to enforce the obligations to arbitrate prior to the arbitration and to enforce the arbitration clause and defend itself from the diverse attempts by Adir to avoid these obligations, both in the courts of California and before the Department of Insurance." Therefore, the arbitration panel allowed Travelers to submit "a separate application for all time expended in defending the action brought by Adir in the state court of California and, as well, before the

12

Department of Insurance."

E.  *Adir Renews Its Motion To Declare the Arbitration Provisions Unenforceable*

1.  Nielsen Contracting, Inc. v. Applied Underwriting, Inc.

Before the arbitration panel issued a final award, on May 3, 2018, the Fourth District Court of Appeal issued *Nielsen Contracting, Inc. v. Applied Underwriters, Inc.* (2018) 22 Cal.App.5th 1096 (*Nielsen*).  In *Nielsen*, in connection with the issuance of a workers' compensation insurance policy, the insurer required the insured to sign a side agreement that "modified and supplanted" many of the policy's terms.  The insurer filed the policy with the Rating Bureau, but did not file the side agreement.  The side agreement also contained an arbitration provision requiring arbitration of disputes in the British Virgin Islands and delegating to the arbitrators the authority to rule on disputes concerning the enforceability of the arbitration provision.  (*Id*. at p. 1102.)  The court in *Nielsen* held that, after the insurer sought to compel arbitration, the insured properly raised an adequate challenge to the arbitration provision's delegation clause to require judicial resolution of the challenge.  (*Id*. at p. 1109.)  The court viewed the delegation clause "as a separate agreement nested within the arbitration agreement." (*Ibid*.)

In rejecting the insurer's argument that courts were "precluded from ruling on specific contract defenses to a delegation clause merely because the same defense is also brought to invalidate other related contractual provisions," the court in *Nielsen* held:  "[T]he focus of the court's attention must be on whether the particular challenge *is directed at* the

13

delegation clause, not whether the same challenges are *also* directed at the agreement or agreements into which the delegation clause is embedded or nested." (*Nielsen, supra,* 22 Cal.App.5th at pp. 1110-1111.) Therefore, the court held that the trial court, not the arbitrator, should determine the enforceability of the specific arbitration provision at issue because the insured had "asserted a specific, substantive challenge to the delegation clause separate from the challenge to the arbitration clause and the underlying contracts . . . ." (*Id.* at p. 1113.) The court in *Nielsen* further held that the "arbitration provision and delegation clause are endorsements and/or collateral agreements to the [insurance] policies because they relate to and materially alter the dispute resolution provisions in the earlier approved policy." (*Id.* at p. 1117.) The court therefore concluded, under section 11658 and regulation 2268, the provisions "must be filed to be effective" and an "unfiled agreement [is] unlawful and void as a matter of law." (*Nielsen,* at p. 1118.) The court affirmed the trial court's denial of the insurer's motion to compel arbitration. (*Id.* at p. 1101.)

### 2. *Adir's Motion*

On June 18, 2018, under the trial court's "inherent authority to reconsider its prior rulings," Adir filed a "renewed" motion seeking to declare the arbitration provision in the agreement "void and unenforceable for illegality." Adir argued that its "position has now been vindicated" by *Nielsen* and that *Nielsen* was "controlling in this case and binding upon this Court." Adir argued that *Nielsen* "squarely addressed the exact issue in this [case], concluding that a nearly identical arbitration clause contained in a nearly identical side agreement to a nearly identical worker's compensation policy was void for illegality and

14

wholly unenforceable against the insured." Adir further argued that *Nielsen* established that the court "was the proper forum for resolving the insured's challenges to the legality of the arbitration clause . . . ." According to Adir, "[T]he *Nielsen* Court makes clear that [the trial court] got this issue wrong when he entered the prior order denying Adir's motion to declare the arbitration agreement void and unenforceable. Adir further asserted, "Because Travelers did not file the arbitration clause at issue with the [Department], as required by California law, Travelers cannot now enforce that arbitration clause against Adir."

### 3.  *Travelers' Opposition*

Travelers argued that Adir failed to present any "new or different facts or law" regarding whether "its challenge to the [agreement] should be before the court or the arbitrator." Travelers further argued: "[The trial] court made its [August 2015] Order referring this matter to arbitration because it found . . . that Adir's challenge was as to the contract as a whole and under U.S. Supreme Court precedent that issue was to be resolved by the arbitrator." Travelers distinguished *Nielsen* because the arbitration clause in *Nielsen* "included a delegation clause"; while its arbitration provisions "include[d] no such delegation language." Thus, Travelers argued, "[B]ecause the only reason that the court in [*Nielsen*] was able to decide the issue of arbitrability, as opposed to the arbitrators, is because the trial court found and the Court of Appeal agreed that Nielsen had raised a sufficient challenge to the enforceability of the delegation clause that was nestled within the arbitration clause to require judicial resolution of the challenge." Adir did "not make a direct challenge to a delegation clause" because "there [was] no

15

delegation clause in the agreement." Therefore, according to Travelers, the "court should and must deny this motion because it [was] not for this court to decide a matter that is within the purview of the arbitration panel as previously ordered."

4. *Trial Court's Ruling*

Finding Adir's motion "procedurally proper," the trial court granted Adir's renewed motion on August 23, 2018. The trial court ruled: "[T]he Court of Appeal [in *Nielsen*] determined that an arbitration agreement in a workers' compensation insurance policy is unenforceable if the insurer did not file the policy with the Insurance Commissioner. . . . The court [in *Nielsen*] further noted that the court, not the arbitrator, should rule on this issue. . . . This new law requires the court to reverse its August 21, 2015 order. The arbitration provisions in the side agreements here are unenforceable." The trial court reasoned that the arbitration provisions were an "endorsement" because they "modified the [policy] by requiring arbitration of specified disputes." Therefore, "Travelers should have submitted" the agreement to the Rating Bureau. Rejecting Travelers' argument that *Nielsen* was distinguishable because of the absence of a delegation clause in the agreement, the trial court ruled: "In [*Nielsen*] the court stated, 'challenges to the validity of the arbitration clause itself are generally resolved by the court in the first instance. An exception to this rule applies when the parties have clearly and unmistakably agreed to delegate questions regarding the validity of the arbitration clause to the arbitrator. Such delegation clauses are generally enforceable according to their terms.' . . . Thus, the court in [*Nielsen*] noted that where, as here, an arbitration agreement does not contain a delegation clause, the court should resolve challenges to the arbitration

16

agreement."

The trial court also ruled, based on *Nielsen*, "a court may rule on a challenge to an arbitration clause even if the same defense would invalidate other contractual provisions, because, under the Federal Arbitration Act, courts must enforce arbitration clauses in the same manner as other contractual provisions." Finally, the trial court acknowledged: "[T]he time spent by the parties, the court, and the arbitration panel over the past three years is rendered a complete waste as a result of this ruling. The arbitration in this case is complete but for the arbitration panel's final award of attorneys' fees to Travelers, the prevailing party. [Adir] is unquestionably getting another bite at the apple it has been repeatedly nibbling at for three years. [¶] However, there is no authority for enforcing an arbitration agreement in violation of a regulatory statute because the arbitration is nearly complete." The trial court recognized that the rule voiding a "'contract made in violation of a regulatory statute'" was "'not an inflexible one to be applied in its fullest vigor under any and all circumstances.'" Travelers timely appealed.

F.      *The Commissioner Issues* Matter of Adir

On November 20, 2018, the Commissioner issued a precedential administrative decision in response to Adir's complaint. Pointing out that "an endorsement is an amendment or modification to an existing policy that alters *any term or condition* of the policy," the Commissioner found that "[a]n endorsement need not concern an insurer's indemnity or insurance obligations," and "many endorsements relate solely to administrative matters, unrelated to risk of loss or indemnity." (*Matter of Adir, supra,* at p. 35.) Therefore, the agreement "was

17

an endorsement" under section 11658 because it "modified several provisions." (*Matter of Adir,* at p. 38.)  Also finding that the agreement was a "collateral agreement" within the meaning of regulation 2268, the Commissioner stated:  "[T]he [agreement] modified [Adir's] reimbursement obligation, added choice of law and arbitration provisions, altered the default and cancellation terms, added indemnity and loss obligations, and added a collateral requirement.  Each of the provisions standing alone modified [Adir's] obligations under the policy.  Taken together, they wholly rewrote [Adir's] insurance program.  Thus, the [agreement] was a collateral agreement under [regulation] 2268." (*Matter of Adir,* at p. 40.)[10]

Regarding dispute resolution, the Commissioner found: "The [agreement] altered the parties' dispute resolution provisions. . . . The policy is silent on choice of law and binding arbitration.  On the other hand, the [agreement] includes a three-page arbitration provision mandating the arbitration of premium and claims-handling disputes.  The [agreement] further requires [Adir] to consent to Connecticut jurisdiction and dictates that Connecticut law applies to the [agreement] and policies.  Travelers intended these provisions to supersede those of the underlying policy.  Indeed, the arbitration provision applies to disputes that may arise . . . about the parties' rights and duties relative to the payment of premium and other charges under this [agreement] and the Policies." (*Matter of Adir, supra,* at p. 38.)

---

**10**    The Commissioner stated:  "Since 1995, Insurance Code section 11658 has required insurers to file all policies or endorsements for approval prior to use.  Since 1968, Regulations section 2268 has prohibited the use of unfiled and unattached collateral agreements." (*Matter of Adir, supra,* at p. 46.)

18

Accordingly, because the agreement was an "endorsement" and a "collateral agreement," the Commissioner found that Travelers violated section 11658 and regulation 2268 by failing to file the agreement with the Rating Bureau. Therefore, the agreement was "unlawful and void as a matter of law." (*Matter of Adir, supra,* at pp. 52, 58, 61.) The Commissioner explained: "Because workers' compensation insurance is usually mandatory, the Commissioner is charged with closely scrutinizing insurance plans to protect workers and employers alike. Sections 11658 and 11735's filing requirements enable the Commission to perform that duty. Insurers who use unfiled rates or unfiled side agreements frustrate public policy. It would defeat the purpose of Insurance Code sections 11658 and 11735 by allowing an insurer to bypass the Commissioner's mandatory review process by simply adding or modifying the policy's terms in a separate, unexamined side agreement." (*Matter of Adir,* at pp. 58-59, fns. omitted.)

On March 20, 2019, Travelers filed a petition for a writ of administrative mandamus in Los Angeles County Superior Court challenging the Commissioner's decision. On April 4, 2019, Travelers moved to stay this appeal pending resolution of the writ proceeding. This court denied Travelers' motion to stay on April 25, 2019.

## DISCUSSION

A. *The Trial Court Had Jurisdiction To Reconsider Its Prior Order on Adir's Renewed Motion*

1. *Applicable Law and Standard of Review*

Code of Civil Procedure section 1008 governs "reconsideration of court orders whether initiated by a party or the court itself. 'It is the exclusive means for modifying,

19

amending or revoking an order.  That limitation is expressly jurisdictional.'"  (*Gilberd v. AC Transit* (1995) 32 Cal.App.4th 1494, 1499; see *Kinda v. Carpenter* (2016) 247 Cal.App.4th 1268, 1278 ["Code of Civil Procedure section 1008 places strict jurisdictional limits on a litigant's ability to seek reconsideration of a prior ruling"].)  "[B]ased upon new or different facts, circumstances, or law," a party's motion for reconsideration of an order must be made within ten days after service of notice of entry of the order.  (Code Civ. Proc., § 1008, subd. (a).)  "A party who originally made an application for an order which was refused in whole or part . . . may make a subsequent application for the same order upon new or different facts, circumstances, or law."  (*Id.*, § 1008, subd. (b).)  The 10-day time limitation does not apply to a party's renewed motion, and the renewed motion may be brought whether "the order deciding the previous matter or motion is interim or final."  (*Id.*, § 1008, subd. (e).)

Further, "[i]f a court at any time determines that there has been a change of law that warrants it to reconsider a prior order it entered, it may do so on its own motion and enter a different order."  (Code Civ. Proc., § 1008, subd. (c); see *Phillips v. Sprint PCS* (2012) 209 Cal.App.4th 758, 768 ["'[w]hen a trial court concludes there has been a change of law that warrants reconsideration of a prior order, it has jurisdiction to reconsider and change its order'"].)  "In addition, the court may consider a number of factors in determining whether to exercise its discretion [under Code of Civil Procedure section 1008, subdivision (c)], including the importance of the change of law, the timing of the motion, and the circumstances of the case."  (*Farmers Ins. Exchange v. Superior Court* (2013) 218 Cal.App.4th

96, 107 (*Farmers Ins. Exchange*); accord, *Phillips v. Sprint PCS,* at p. 769.)

"Even without a change of law, a trial court has the inherent power to reconsider its prior rulings on its own motion at any time before entry of judgment." (*State of California v. Superior Court (Flynn)* (2016) 4 Cal.App.5th 94, 100 (*State of California*); accord, *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1098, 1107 (*Le Francois*); *Phillips v. Sprint PCS, supra*, 209 Cal.App.4th at p. 768; *Darling, Hall & Rae v. Kritt* (1999) 75 Cal.App.4th 1148, 1156.) In *Le Francois,* the Supreme Court held that, while Code of Civil Procedure section 1008 limits "the parties ability to file repetitive motions," it does limit "not the court's ability, on its own motion, to reconsider its prior interim orders so it may correct its own errors." (*Le Francois*, at p. 1107.) The Court held that it does "not matter whether the 'judge has an unprovoked flash of understanding in the middle of the night' [citation] or acts in response to a party's suggestion. If a court believes one of its prior interim orders was erroneous, it should be able to correct that error no matter how it came to acquire that belief." (*Id*. at p. 1108.) ""Miscarriage of justice results where a court is unable to correct its own perceived legal errors."" (*State of California*, at p. 100; accord, *Kerns v. CSE Ins. Group* (2003) 106 Cal.App.4th 368, 389, fn. 18.) The court "should inform the parties of this concern [of an erroneous ruling], solicit briefing, and hold a hearing." (*Le Francois*, at p. 1108.)

"A trial court's ruling on a motion for reconsideration is reviewed under the abuse of discretion standard." (*Farmers Ins. Exchange, supra,* 218 Cal.App.4th at p. 106; accord, *Phillips v. Sprint PCS, supra*, 209 Cal.App.4th at p. 769; *Ovitz v. Schulman* (2005) 133 Cal.App.4th 830, 848; *Glade v. Glade* (1995) 38

21

Cal.App.4th 1441, 1457.)  "All exercises of discretion must be guided by applicable legal principles, however, which are derived from the statute under which discretion is conferred."  (*Farmers Ins. Exchange,* at p. 106.)  "If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law."  (*Ibid.*; *F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 15-16.)  To the extent our inquiry requires analysis of questions of law, we undertake independent review.  (*Citizens of Humanity, LLC v. Applied Underwriters, Inc.* (2017) 17 Cal.App.5th 806, 811.)

In *Farmers Ins. Exchange*, *supra*, 218 Cal.App.4th 96, the court held that the trial court abused its discretion in refusing to reconsider an order granting class certification because of the depublication of the decision on which it had relied to certify the class.  (*Id.* at p. 111.)  The court explained that the "importance of the change of law . . . cannot be understated" because the depublished decision "provided the sole legal authority for the trial court's grant of class certification."  (*Ibid.*)  In other words, "the entire legal justification for the trial court's certification order disappeared with the depublication of the [decision]."  (*Ibid.*)  The court further held that the "timing of the reconsideration request was prompt" after the depublication and that there was no prejudice because "nothing had occurred in the case in reliance on the certification order."  (*Ibid*; see *Phillips v. Sprint PCS, supra,* 209 Cal.App.4th at p. 769 ["[g]iven the significance of the [*AT&T Mobility LLC v.*] *Concepcion* [(2011) 563 U.S. 333 (*Concepcion*)] decision, the absence of near-readiness for trial, and the failure to make any showing of

prejudice, the trial court acted properly here in revisiting the earlier order denying arbitration"].)

2. *The Trial Court Did Not Abuse Its Discretion in Granting Reconsideration*

Travelers argues that "*Nielsen* did not announce 'new or different' law" because "the Supreme Court in *Rent-A-Center*, [*supra,* 561 U.S. 63] acknowledged that a defense to an arbitration agreement may be grounded on a defense that applies to the contract as a whole, so long as the challenge is *directed to* the arbitration agreement specifically . . . ." Travelers further argues that any purported "new law . . . was not relevant to the question" the trial court decided in its August 2015 order. According to Adir, prior to *Nielsen,* the law was "unsettled" as to whether the court or an arbitrator should rule on a challenge to "a specific arbitration provision on grounds that also invalidate the entire contract." Adir therefore argues that *Nielsen* was new law because it "held that a court, not an arbitrator, must determine an insured's challenge to the legality of the arbitration clause," "regardless of 'whether the challenge is the same as or different from the challenge to other provisions of the arbitration clause or underlying agreement.'" Adir further argues that *Nielsen* established that an insurer's unfiled arbitration agreement was unenforceable and void. We conclude that *Nielsen* constituted "new" law under Code of Civil Procedure section 1008, subdivision (b).

Under *Nielsen*, not only was the arbitration provision at issue "unlawful and void, as a matter of law," but also, because Adir asserted a specific challenge to the arbitration provision at issue, the trial court "was the proper entity to rule on" that

23

challenge.[11]  (*Nielsen, supra,* 22 Cal.App.5th at pp. 1113, 1118.) In *Nielsen*, as here, a workers' compensation insurer sought to collect premiums from an insured in arbitration based on an unfiled arbitration agreement.  *Nielsen* was relevant because it clarified that, when a party asserts a defense to the "'precise agreement to arbitrate at issue,'" and the same defense may also invalidate the entire contract, the court resolves the challenge to the specific arbitration provision at issue.  Further, as Adir points out, "Before *Nielsen,* no California appellate court had considered whether to enforce an unfiled arbitration clause contained in an unfiled Side Agreement."  (See *American Zurich Ins. Co. v. Country Villa Service Corp.* (C.D.Cal., July 9, 2015, No. 2:14-cv-03779-RSWL-AS) 2015 U.S.Dist. Lexis 89452, pp. 11, 28, fn. 17, 32 [concluding that an unfiled collateral agreement "that alters or adds to any term or condition of an insurance policy" was

---

[11]    Although Travelers argued in the trial court that *Nielsen* was distinguishable because the arbitration clause in *Nielsen* "included a delegation clause," but the arbitration provisions here did not contain a delegation clause, Travelers stated at argument that the analysis was the same whether or not there was a delegation clause in the arbitration provisions.  (See *Rent-A-Center, supra,* 561 U.S. at p. 70 ["[a]n agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other"]; *Jackpot Harvesting, Inc. v. Applied Underwriters, Inc.* (2019) 33 Cal.App.5th 719, 730, fn. 11 (*Jackpot Harvesting*) ["[t]he same legal test governs the inquiries whether an arbitration agreement is severable from the rest of the contract such that a court should decide its validity and whether a court or an arbitrator should review the enforceability of a delegation clause"].)

invalid under section 11658, but stating that "no published California opinion controls" and there was only one "California [unpublished] opinion on the issue"].)

Because the facts in *Nielsen* so closely resembled the facts here, the trial court correctly concluded that *Nielsen* "binds this court." (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["[d]ecisions of every division of the District Courts of Appeal are binding upon all the justice and municipal courts and upon all the superior courts of this state"]; *Cuccia v. Superior Court* (2007) 153 Cal.App.4th 347, 353 ["'[c]ourts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction'"]; *Gwartz v. Superior Court* (1999) 71 Cal.App.4th 480, 481-482 ["sometimes it seems as though we have to remind the lower court there is a judicial pecking order when it comes to the interpretation of statutes"]; *Walsh v. West Valley Mission Community College Dist.* (1998) 66 Cal.App.4th 1532, 1542, fn. 4 ["all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction"].)

The trial court acted within its discretion in granting Adir's motion for reconsideration. In granting reconsideration, the trial court reasonably could have considered that the ruling in *Nielsen* effectuated important public policy. The court in *Nielsen* pointed out that "workers' compensation insurance (or an adequate substitute) is mandatory" and that the "Commissioner is charged with closely scrutinizing insurance plans to protect both workers and their employers." (*Nielsen, supra,* 22 Cal.App.5th at p. 1118.) By failing to file the arbitration provisions, Travelers "prevent[ed] crucial regulatory oversight" by the Commissioner. (*Ibid*.) The court in *Nielsen* held that section 11658 and

25

regulation 2268 "would have no meaning if the insurer could enforce contracts despite having violated the disclosure and approval requirements. Allowing the insurer to make material modifications to the filed and approved dispute resolution mechanism without the knowledge of the Rating Bureau or the Insurance Commissioner would effectively remove any regulatory oversight of this process." (*Nielsen,* at p. 1118.) Moreover, the trial court also reasonably could have considered Adir's loss of its constitutional right to a jury trial through an arbitration provision that the court in *Nielsen* held was unlawful and void. (Cal. Const., art. I, § 16 ["[t]rial by jury is an inviolate right . . . ."]; *Lawrence v. Walzer & Gabrielson* (1989) 207 Cal.App.3d 1501, 1507 [right to a jury trial is a "substantial" and "valuable" right].)

Although Adir promptly filed its motion for reconsideration within a month after the court of appeal issued *Nielsen*, the arbitration panel had issued an interim award in favor of Travelers in July 2017. In evaluating whether to reconsider its ruling, the trial court acknowledged that "the time spent by the parties, the court, and the arbitration panel over the past three years" would be rendered "a complete waste" if it vacated the August 2015 order denying Adir's motion to declare the arbitration provisions unenforceable and declared the arbitration provisions unenforceable. However, "[t]he progress of the arbitration is not material when considering a change in the law affecting whether the arbitral forum was a correct one." (*Malek v. Blue Cross of California* (2004) 121 Cal.App.4th 44, 60.) Further, Adir had raised the same illegality challenge to the arbitration provision in the trial court in 2015 and before the arbitration panel in 2016. Travelers also knew since 2011 that

26

the Commissioner contended the use of unfiled arbitration provisions violated California law.  Nonetheless, Travelers failed to file the arbitration provisions for Adir's final policy year with the Rating Bureau for the Commissioner's review.

Under these circumstances, the trial court acted within its discretion in reconsidering the August 2015 decision based on *Nielsen*.  (See *State of California, supra,* 4 Cal.App.5th at p. 100 ["[a]n appellate decision published during an action's pendency may be a change of law under [Code of Civil Procedure] section 1008, subdivision (c), and requires a trial court to reconsider its earlier ruling if the decision materially changed the law"]; *Valdez v. Himmelfarb* (2006) 144 Cal.App.4th 1261, 1275 [an appellate ruling on the correct statute of limitations was a change in the law that mandated reconsideration of sanctions imposed on a plaintiff for violating the statute of limitations]; *Blake v. Ecker* (2001) 93 Cal.App.4th 728, 739 [the Supreme Court's resolution of a previously disputed issue constituted a change in the law mandating reconsideration]; *International Ins. Co. v. Superior Court* (1998) 62 Cal.App.4th 784, 788 ["we think [Code of Civil Procedure section 1008, subdivision (c)] means exactly what it says−when a trial court concludes there has been a change of law that warrants reconsideration of a prior order, it has jurisdiction to reconsider and change its order"].)

Travelers' argument that "[t]his case is on all fours with *Ovitz v. Schulman* (2005) 133 Cal.App.4th 830" is misguided.  In *Ovitz*, a party sought reconsideration, arguing that there was "new law" based on a Ninth Circuit decision.  In holding that the trial court did not abuse its discretion in denying the reconsideration motion, the court held that the Ninth Circuit decision was not new law because it "relied on earlier decisions

27

from other circuits that 'invoked [the same principle].'" (*Id.* at p. 848.) The court held that the party seeking reconsideration "could have relied on these decisions [from the other circuits] to raise the issue earlier." (*Ibid.*) The court pointed out that "[d]ecisions by the Ninth Circuit have no greater persuasive force on California courts than those of other circuits." (*Ibid.*) Here, in contrast, *Nielsen* was binding new authority because there was no previous published California authority regarding the issues raised by Adir's motion.[12]

> B. *The Trial Court Properly Ruled It, Not the Arbitration Panel, Should Decide Adir's Challenge to the Arbitration Provisions*

> 1. *Applicable Law and Standard of Review*

"'[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he [or she] has not agreed so to submit.'" (*AT&T Technologies, Inc. v*

---

[12] Although Travelers did not cite *Malone v. Superior Court* (2014) 226 Cal.App.4th 1551 in its briefing, at argument, Travelers relied on *Malone* to argue that *Nielsen* was not new law. In *Malone,* an employee "argued both that the arbitration agreement was unconscionable generally, and that the delegation clause was unconscionable under" three California appellate decisions, "which held such clauses to be unenforceable." (*Malone,* at pp. 1555, 1560.) The employee's unconscionability challenge to the delegation clause "stood alone" because it was "distinct" from the challenge to the agreements' other clauses. (*Id.* at p. 1558, fn. 4.) Thus, *Malone* did not involve a situation in which the same defense equally applied to the specific arbitration provision at issue and the entire agreement. In contrast, in *Nielsen*, the same illegality defense also invalidated the entire agreement. (*Nielsen, supra,* 22 Cal.App.5th at p. 1110.)

28

*Communications Workers* (1986) 475 U.S. 643, 648; see *Rent-A-Center, supra,* 561 U.S. at p. 67; *First Options of Chicago, Inc. v Kaplan* (1995) 514 U.S. 938, 943.)  Section 2 of the FAA provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  (9 U.S.C. § 2.)  The "FAA thereby places arbitration agreements on an equal footing with other contracts [citation] and requires courts to enforce them according to their terms."  (*Rent-A-Center,* at p. 67; accord, *Buckeye Check Cashing, Inc. v. Cardegna* (2006) 546 U.S. 440, 443-444 (*Buckeye*).)  Section 2 of the FAA "states that a 'written provision' 'to settle by arbitration a controversy' is 'valid, irrevocable, and enforceable' *without mention* of the validity of the contract in which it is contained."  (*Rent-A-Center,* at p. 70.)  Therefore, "as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract."  (*Buckeye,* at p. 445; accord, *Nitro-Lift Technologies, L.L.C. v. Howard* (2012) 568 U.S. 17, 21 (*Nitro-Lift Technologies*).  "A recurring question under § 2 [of the FAA] is who should decide whether 'grounds . . . exist at law or in equity' to invalidate an arbitration agreement."  (*Preston, supra,* 552 U.S. at p. 353.)

As the United States Supreme Court has held, "Challenges to the validity of arbitration agreements . . . can be divided into two types," namely, "challenges specifically the validity of the agreement to arbitrate" and the "other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.,* the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions

29

renders the whole contract invalid." (*Buckeye, supra,* 546 U.S. at p. 444, fn. omitted; accord, *Rent-A-Center*, *supra,* 561 U.S. at p. 70.)  The Supreme Court has held that a court only decides the first type of challenge to the validity of the "arbitration clause itself" because the arbitration clause is severed under section 2 of the FAA.  (*Buckeye,* at p. 445.)  "Thus, a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." (*Rent-A-Center,* at p. 70; see *Preston, supra,* 552 U.S. at p. 353 ["attacks on the validity of an entire contract, as distinct from attacks aimed at the arbitration clause, are within the arbitrator's ken"].)  "[C]ourts treat an arbitration clause as severable from the contract in which it appears and enforce it according to its terms unless the party resisting arbitration specifically challenges the enforceability of the arbitration clause itself." (*Granite Rock Co. v. Int'l. Bhd. Of Teamsters* (2010) 561 U.S. 287, 301; *see New Prime Inc. v. Oliveira* (2019) ___ U.S. ___, ___, 139 S.Ct. 532, 538; *Nitro-Lift Technologies, supra,* 568 U.S. at p. 21; *Rent-A-Center,* at p. 71; *Buckeye*, at p. 445.)

The Supreme Court has also held that "parties can agree to arbitrate 'gateway' questions of 'arbitrability'" in a "delegation" clause.  (*Rent-A-Center, supra,* 561 U.S. at pp. 68-69; see *Buckeye, supra,* 546 U.S. at p. 445.)  The rule of severability extends to delegation clauses, which are severable from larger arbitration provisions.  (See *Rent-A-Center,* at pp. 71-72; *Henry Schein, Inc. v. Archer & White Sales, Inc.* (2019) ___ U.S. ___, ___, 139 S.Ct. 524, 529.)  Thus, where a contract contains a valid delegation to the arbitrator of the power to determine arbitrability, such a clause will be enforced absent a specific challenge to the

delegation clause by the party resisting arbitration. (*Rent-A-Center,* at pp. 71-72.)

When the issue of arbitrability turns on a question of law, we review the superior court's decision de novo. (*Avila v. Southern California Specialty Care, Inc.* (2018) 20 Cal.App.5th 835, 839; accord, *Citizens of Humanity, LLC v. Applied Underwriters, Inc., supra,* 17 Cal.App.5th at p. 811; *Ramos v. Westlake Services LLC* (2015) 242 Cal.App.4th 674, 686.)

### 2. *The "Who Decides" Issue*

In *Prima Paint Corp. v. Flood & Conklin Mfg. Co.* (1967) 388 U.S. 395 (*Prima Paint*), the Supreme Court held: "[I]f the claim is fraud in the inducement of the arbitration clause itself−an issue which goes to the 'making' of the agreement to arbitrate−the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." (*Id.* at pp. 403-404.) The Court explained why a specific challenge to an arbitration clause is for the court: "To immunize an arbitration agreement from judicial challenge on the ground of fraud in the inducement would be to elevate it over other forms of contract−a situation inconsistent with the 'saving clause.'" (*Id.* at p. 404, fn. 12.) In *Prima Paint,* because the alleged fraudulent inducement that the party was "solvent and able to perform its contractual obligations" went to the contract as a whole, the Court held that the matter was properly referred to the arbitrators. (*Id.* at p. 398.) Subsequently, in *Buckeye, supra,* 546 U.S. 440, a borrower alleged that a check cashing company charged usurious interest rates, rendering the entire agreement with the check cashing company "illegal and void *abinitio*." (*Id.* at p. 443.) The Supreme Court held "*Prima Paint*'s rule of

31

severability required that the arbitrator decide the challenge to the arbitration provision contained in the parties' agreement because the challenge was "to the validity of the contract as a whole, and not specifically to the arbitration clause . . . ." (*Buckeye,* at p. 449.)  The Supreme Court stated that the "*Prima Paint* rule permits a court to enforce an arbitration agreement in a contract that the arbitrator later finds to be void." (*Buckeye,* at p. 448.)

Further, in *Preston, supra,* 552 U.S. 346, a performer sought to avoid arbitration by asserting that a California statute required an administrative agency to decide whether an agreement with the performer's attorney was void because the attorney acted as an unlicensed talent agent.  (*Id.* at p. 350.)  The arbitration provision provided that any dispute relating to the validity or legality of the agreement shall be submitted to the arbitrator.  (*Ibid.*)  After framing the "question [as] simply who decides whether [the performer's attorney] acted as a personal manager or as talent agent," the Supreme Court in *Preston* held that its decision in "*Buckeye* largely, if not entirely, resolves the dispute" because the performer "sought invalidation of the contract as a whole" and "made no discreet challenge to the validity of the arbitration clause." (*Preston,* at pp. 352, 354.)  The Court observed that by "'agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral . . . forum.'" (*Id.* at p. 359.)  Therefore, the Court held the performer could not "escape resolution of [his statutory] rights in an arbitral forum." (*Ibid.*)

In *Rent-A-Center, supra*, 561 U.S. 63, the Supreme Court held that the delegation clause in the arbitration agreement was

"simply an additional, antecedent agreement" that was severed under section 2 of the FAA. (*Id.* at p. 70.) Because the employee challenged the arbitration agreement as a whole and did not specifically challenge the severed delegation clause, the Supreme Court in *Rent-A-Center* held "any challenge to the validity of the Agreement as a whole [was] for the arbitrator." (*Id.* at pp. 70, 72.) The Supreme Court suggested that, "had [the employee] challenged the delegation provision by arguing that these [alleged unconscionable] procedures *as applied* to the delegation provision rendered *that provision* unconscionable, the challenge should have been considered by the court." (*Id.* at p. 74.) The Court stated that such an unconscionability challenge to the delegation clause would have been "a much more difficult argument to sustain" than the same unconscionability argument made regarding the arbitration agreement as a whole. (*Ibid.*) The Court in *Rent-A-Center* also noted that, if in *Prima Paint* "the claim had been 'fraud in the inducement of the arbitration clause itself,' then the court would have considered it." (*Rent-A-Center,* at p. 71.) Further, in *Nitro-Lift Technologies, supra,* 568 U.S. 17, employees alleged in court noncompetition agreements were "null and void" under a state statute that limited the enforceability of noncompetition agreements. (*Id.* at p. 18.) Relying on *Buckeye,* the Supreme Court held that under section 2 of the FAA, it was "for the arbitrator to decide in the first instance whether the covenants not to compete are valid as a matter of applicable state law." (*Nitro-Lift Technologies,* at p. 22.) The Supreme Court held: "an 'arbitration provision is severable from the remainder of the contract' [citation], and its validity is subject to initial court determination; but the validity

33

of the remainder of the contract (if the arbitration provision is valid) is for the arbitrator to decide." (*Id.* at p. 21.)

### 3. *The Trial Court Did Not Err in Ruling It Should Resolve the Enforceability Issue*

In its renewed motion, Adir asserted a challenge specifically against the arbitration provisions that were "'severable from the remainder of the contract.'" (*Rent-A-Center, supra,* 561 U.S. at p. 71; accord, *Buckeye, supra,* 546 U.S. at p. 445.) Adir argued the arbitration provisions constituted an "endorsement" under section 11658 because they altered the dispute resolution provisions in the policy. Adir maintained that the severed provisions were "void and unenforceable for illegality" because Travelers failed to file the provisions with the Rating Bureau as required by section 11658. Adir's challenge to the arbitration provisions did not depend on the illegality of the agreement as a whole or any other part of the agreement; Adir argued that the arbitration provisions were unenforceable and void because they constituted an endorsement and section 11658 required Travelers to file the provisions. Thus, Adir made a direct challenge to the severed arbitration provisions by arguing the arbitration provisions were void, independent from the legality of any other part of the agreement. (See *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.* (9th Cir. 2010) 622 F.3d 996, 1000 ["when a plaintiff argues that an arbitration clause, standing alone, is unenforceable−for reasons independent of any reasons the remainder of the contract might be invalid−that is a question to be decided by the court"].)

Adir's challenge to the arbitration provisions was distinguishable from the challenges to the contracts as a whole at issue in *Preston, supra,* 552 U.S. 346, *Buckeye, supra,* 546 U.S.

34

440, and *Nitro-Lift Technologies, supra,* 568 U.S. 17.  In *Preston, Buckeye,* and *Nitro-Lift Technologies,* the party opposing arbitration argued that the entire agreement was unenforceable based on illegality concerning a provision other than the arbitration clause.  Without a discrete challenge to the arbitration clause, the Supreme Court in those cases held that the question of the agreements' legality as a whole was for the arbitrator.  However, as the Supreme Court contemplated in *Rent-A-Center, supra,* 561 U.S. 63 and *Prima Paint, supra,* 388 U.S. 395, when a challenge is asserted against the arbitration provision itself, the court decides the challenge.  (*Rent-A-Center,* at p. 74; *Prima Paint,* at pp. 403-404; see *Lynch v. Cruttenden & Co.* (1993) 18 Cal.App.4th 802, 810 ["[h]ere, it is alleged the parties were misled as to the very existence of the arbitration clause.  In *Prima Paint* the fraud went to the making of the contract generally, not to the making of the arbitration clause"].)

The Supreme Court in *Rent-A-Center* observed that if the unconscionability argument also had been asserted against the severed delegation clause, "the challenge should have been considered by the court," although it would have been "a much more difficult argument to sustain."  (*Rent-A-Center, supra,* 561 U.S. at p. 74.)  Here, the situation is unique because the agreement contained policy modifications on several subjects (for example, a collateral requirement, indemnity and loss obligations, and default and cancellation terms), each of which sufficiently modified the policy to qualify as an "endorsement."  Each would be subject to the same illegality challenge because Travelers failed to file the agreement with the Rating Bureau under section 11658.  However, Adir's assertion that other provisions in the agreement were also void based on Travelers'

failure to file the agreement, or even that the entire agreement was likewise void on that ground, does not change the analysis. Adir asserted a discrete and independent challenge to the arbitration provisions regardless of the legality of the remaining parts of the agreement. (*Minnieland Private Day School, Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.* (4th Cir. 2017) 867 F.3d 449, 455 ["*Rent-A-Center* makes clear, however, that '[i]f a party challenges the validity under [section 2 of the FAA] of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement"]; see *Gibbs v. Haynes Investments, LLC* (4th Cir. 2020) 967 F.3d 332, 338 ["the borrowers argued that the 'delegation clause[s] [are] unenforceable for the same reason as the underlying arbitration agreement−the . . . wholesale waiver of the application of federal and state law[.]' . . . And as *Rent-A-Center* observed, such a challenge is all that is required to dispute the viability of the delegation provisions"]; *MacDonald v. CashCall, Inc.* (3d Cir. 2018) 883 F.3d 220, 226-227 ["[i]n specifically challenging a delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions"].)

In *Jackpot Harvesting, supra,* 33 Cal.App.5th 719, *Luxor Cabs, Inc. v. Applied Underwriters Captive Risk Assurance Co.* (2018) 30 Cal.App.5th 970 (*Luxor Cabs*), and *Nielsen, supra,* 22 Cal.App.5th 1096, the courts held that the trial court properly determined challenges to unfiled arbitration clauses under section 11658 because the insureds had asserted a specific illegality challenge to the pertinent arbitration provisions. (*Luxor Cabs,* at pp. 980-981 ["the trial court properly determined that it was the proper forum for determining arbitrability"

36

because "it is beyond serious dispute that [the insured] directed a specific challenge to the delegation clause of the [arbitration agreement] as mandated by *Rent-A-Center*"]; *Jackpot Harvesting,* at p. 733 [the insured "asserted a specific challenge to the arbitration agreement . . . that was distinct from other claims it made with respect to other elements of the [insurance] program . . . In light of this specific challenge to the arbitration agreement, the trial court was obligated to consider its validity "]; *Nielsen,* at p. 1113 [the insured "asserted a specific, substantive challenge to the delegation clause separate from the challenge to the arbitration clause and the underlying contracts, and this challenge was not merely a device to challenge other provisions in the contract"].)

Although Travelers does not argue that challenge to the arbitration agreement must be different from a challenge directed to the agreement as a whole, the courts in *Jackpot Harvesting, supra,* 33 Cal.App.5th 719, *Luxor Cabs, supra,* 30 Cal.App.5th 970, and *Nielsen, supra,* 22 Cal.App.5th 1096 rejected such an argument. The court in *Nielsen* held: "If we were to accept defendants' argument that courts are precluded from ruling on specific contract defenses to a delegation clause merely because the same defense is also brought to invalidate other related contractual provisions, we would be treating delegation clauses differently than other contractual clauses, a determination that would be inconsistent with the FAA, as interpreted by the United States Supreme Court." (*Nielsen,* at p. 1110; see *Luxor Cabs,* at p. 981 ["to reject a legitimate contractual challenge to a severed delegation clause merely because similar grounds are suggested as a basis for invalidating the related arbitration provision or entire contract is nonsensical

37

and violates the FAA's mandate that courts 'must "place[ ] arbitration agreements [such as delegation clauses] on an equal footing with other contracts"'"]; *Jackpot Harvesting,* at p. 732 ["[w]hile the United States Supreme Court has repeatedly emphasized that for a court (rather than an arbitrator) to determine the validity of the arbitration agreement, the party opposing arbitration must "'challenge[ ] specifically the validity of the agreement to arbitrate,'" [citation] it has nowhere required that the legal argument upon which the challenge is based must relate solely to the arbitration agreement"].)  The trial court properly determined that it was the correct forum for determining the enforceability of the arbitration provisions.

C.      *The Trial Court Did Not Err in Concluding that the Arbitration Provisions Were Unenforceable and Void*

Travelers argues, "The arbitration agreement here is not a policy, endorsement, or collateral agreement because it does not materially alter the dispute-resolution provisions of the Policy." Therefore, Travelers argues that it was not required to file the arbitration provision with the Rating Bureau.  Relying on *Jackpot Harvesting, supra,* 33 Cal.App.5th 719, *Luxor Cabs, supra,* 30 Cal.App.5th 970, and *Nielsen, supra,* 22 Cal.App.5th 1096, Adir argues that, because "Travelers' unfiled arbitration agreement modified Adir's right to initiate a civil action to resolve disputes under the policy," "Travelers was required to file and obtain approval of its arbitration agreement."  According to Adir, "an insurer's unfiled arbitration agreement is void and unenforceable against the insured."  The trial court correctly concluded that the arbitration provisions in the agreement were

38

an "endorsement" because they "modified the [policy] by requiring arbitration of specific disputes."

### 1. *Applicable Law and Standard of Review*

Under section 11658, subdivision (a), an insurer cannot issue a workers' compensation policy or an endorsement to a policy "unless the insurer files a copy of the form or endorsement with the [Rating Bureau] . . . and 30 days have expired from the date the form or endorsement is received by the commissioner from the [Rating Bureau] . . . ." "'An endorsement is an amendment to or modification of an existing policy of insurance.'" (*Luxor Cabs, supra,* 30 Cal.App.5th at p. 982; accord, *Nielsen, supra,* 22 Cal.App.5th at p. 1117; *Adams v. Explorer Ins. Co.* (2003) 107 Cal.App.4th 438, 451.) Further, an endorsement "'may be attached to a policy at its inception or added during the term of the policy'" and "'"may alter or vary any term or condition of the policy."'" (*Luxor Cabs,* at p. 982; accord, *Jackpot Harvesting, supra,* 33 Cal.App.5th at p. 736.) Regulation 2268 provided: "No collateral agreements modifying the obligation of either the insured or the insurer shall be made unless attached to and made part of the policy . . . ." "A collateral agreement is a 'secondary,' 'accompanying,' or 'auxiliary' agreement." (*Nielsen,* at pp. 1114, 1117.)

"Generally a contract made in violation of a regulatory statute is void." (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 435; accord, *Malek v. Blue Cross of California, supra,* 121 Cal.App.4th at p. 70; *Arya Group, Inc. v. Cher* (2000) 77 Cal.App.4th 610, 615.) However, "'the rule is not an inflexible one to be applied in its fullest vigor under any and all circumstances.'" (*Arya, supra,* at p. 615.) "[T]here are exceptions to this rule if the unenforceability would

result in unjust enrichment, forfeiture, or other form of unfair outcome." (*Nielsen, supra,* 22 Cal.App.5th at p. 1118; accord, *Malek v. Blue Cross of California,* at pp. 70-71.) Courts have held that arbitration provisions were unenforceable and void when the workers' compensation insurer violated section 11658 by failing to file the provisions with the Rating Bureau. (*Jackpot Harvesting, supra,* 33 Cal.App.5th at p. 734; *Luxor Cabs, supra,* 30 Cal.App.5th at pp. 986-987; *Nielsen,* at pp. 1119-1120.)

"Whether the arbitration agreement . . . is invalid because it violates section 11658 is a question of law subject to de novo review." (*Jackpot Harvesting, Inc., supra,* 33 Cal.App.5th at p. 735; see *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2015) 234 Cal.App.4th 459, 467.)

> 2. *The Trial Court Did Not Err in Concluding that the Arbitration Provisions Were an "Endorsement" and a "Collateral Agreement"*

An insured under a workers' compensation insurance policy can file a judicial action against its insurer to dispute the premiums owing under the policy, "including a challenge that the amount of the premium was too high as a result of the insurer's wrongful conduct." (*State Comp. Ins. Fund v. ReadyLink Healthcare, Inc.* (2020) 50 Cal.App.5th 422, 460.) Although the "Policyholder Notice" provided that, based on sections 11737 and 11753.1, Adir could appeal certain of Travelers' rating classification decisions to the Commissioner, "[n]either of these provisions indicates that the Insurance Commissioner has the authority to consider the common law breach of contract and other collection claims raised by [the insurer] in this action, or to consider the equitable and other affirmative defenses to [the insurer's] claims asserted by [the insured]." (*State Comp. Ins.*

40

*Fund*, at p. 459; see *id*. at p. 460 ["courts have rejected the idea that an insured must first exhaust administrative remedies through an appeal to the Insurance Commissioner before asserting claims of breach of contract against its insurer, including breaches that place the amount of premium in dispute"].)

The policy did not diminish Adir's right to litigate premium disputes against Travelers in court. Even if the policy provision titled "Actions Against Us," which provided that there will be no right of action against Travelers unless the "amount you owe has been determined . . . by actual trial and final judgment," applies to coverage disputes as Travelers suggests, the provision did not impact Adir's ability to maintain an action in court regarding premium disputes. Thus, under the policy, Adir could litigate in court disputes regarding the premiums owing to Travelers, including the disputes at issue in this action. (See *Jackpot Harvesting, supra,* 33 Cal.App.5th at p. 736 [the policy "does not provide for arbitration but rather allows for administrative review by the Insurance Commissioner for certain disputes and otherwise leaves [the insured's] rights to judicial review intact"]; *Luxor Cabs, supra,* 30 Cal.App.5th at p. 983 ["[o]ther than this right to administrative review under specified circumstances, the CIC Policy is silent as to the resolution of disputes, leaving intact all of the insured standard rights to judicial review"].)

The arbitration provisions in the agreement materially changed how disputes concerning premiums would be resolved. By providing for arbitration concerning the "premium and other charges" due under the policy, the arbitration provisions eliminated Adir's right to sue Travelers in court. As Adir points out, the arbitration provisions also purported to restrict Adir's

41

ability under section 11737 to appeal to the Commissioner a rating reclassification that "results in an increased premium" because the arbitration provisions covered disputes "about the parties rights and duties relative" to premiums and provided that Connecticut law would govern the resolution of such disputes. By requiring the arbitration of certain disputes and providing for the application of Connecticut law, the arbitration provisions materially modified the policy. The provisions were an endorsement under section 11658 and a collateral agreement under regulation 2268. Accordingly, California law required Travelers to file the arbitration provisions with the Rating Bureau for the Commissioner's review for the provisions to be effective. (*Jackpot Harvesting, supra,* 33 Cal.App.5th at p. 737 ["[b]ecause the arbitration agreement . . . materially changed the dispute resolution terms of the [policy], the provision constitutes 'a collateral agreement that should have been filed and endorsed to the Policy' under section 11658"]; *Luxor Cabs, supra,* 30 Cal.App.5th at pp. 983, 985 [because the unfiled arbitration provision "alters or adds to the dispute resolution provisions of the [policy]," the arbitration provision was a "collateral agreement under section 11658 and Regulations former section 2268 [and] should have been filed and endorsed to the Policy"]; *Nielsen, supra,* 22 Cal.App.5th at p. 1117 [the "arbitration provision and delegation clause are endorsements and/or collateral agreements to the [policy] because they relate to and materially alter the dispute resolution provisions in the earlier approved policy"].)

In *Matter of Adir,* the Commissioner found that the arbitration provision "modified [Adir's] obligations under the policy" because the policy was "silent" regarding "choice of law

42

and binding arbitration," while the "three-page arbitration provision mandate[ed] the arbitration of premium and claim-handling disputes. . . . and dictate[d] that Connecticut law applie[d] to the [agreement] and [the policy]." (*Matter of Adir, supra,* at p. 38.)  Further, the Commissioner in *Matter of Shasta Linen* found that regulation 2268 was "clear on its face" that "unendorsed side agreements are prohibited" and an "arbitration obligation" comes within the definition of a "side agreement" that must be filed before it was effective.  (*Matter of Shasta Linen,* at p. 43.)  The Commissioner's reasoning is sound.  (See generally *Yamaha Corp. of America v. State Board of Equalization* (1998) 19 Cal.4th 1, 7 ["the binding power of an agency's *interpretation* of a statute or regulation is contextual:  Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation"]; *Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 391 ["the construction of a statute by officials charged with its administration, including their interpretation of the authority invested in them to implement and carry out its provisions, is entitled to great weight'"].)

Travelers has not argued that the arbitration provisions should be excepted from the rule that a contract made in violation of a regulatory statute was void.  Accordingly, because Travelers did not file the arbitration provisions as required by section 11658 and regulation 2268, the arbitration provisions were unenforceable and void.  (*Jackpot Harvesting, supra,* 33 Cal.App.5th at p. 788; *Luxor Cabs, supra,* 30 Cal.App.5th at pp. 986-987; *Nielsen, supra,* 22 Cal.App.5th at pp. 1118-1120; see *Malek v. Blue Cross of California, supra,* 121 Cal.App.4th at pp. 71-72.)

43

D.    *The FAA Does Not Preempt Section 11658*

Travelers contends that the FAA preempts section 11658 because, although section 11658 and regulation 2268 "do not 'single out' arbitration agreements for unfavorable treatment, they also do not provide for the 'revocation of any contract,' as the FAA's savings clause unambiguously requires."  Adir argues that the "FAA does not preempt" section 11658 because "[s]ection 11658 establishes a state-law contract defense that applies equally to both arbitration agreements and other types of contracts.  Section 11658 does not single out arbitration agreements for negative treatment."  We conclude that the FAA does not preempt section 11658.[13]

1.    *Applicable Law and Standard of Review*

As stated, the FAA's "saving clause" provides that contractual arbitration provisions are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  (9 U.S.C. § 2.)  "This saving clause permits agreements to arbitrate to be invalidated by

---

[13]    Although Adir argues that Travelers forfeited the preemption argument by failing to raise it in the trial court, we decline to find forfeiture.  (See *Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 331 ["[t]he Authority may raise the issue of federal preemption for the first time on appeal"]; *Rental Housing Assn. of Northern Alameda County v. City of Oakland* (2009) 171 Cal.App.4th 741, 755 [considering preemption argument raised for the first time on appeal]; see generally *Francies v. Kapla* (2005) 127 Cal.App.4th 1381, 1386 [exercising discretion to address new arguments on appeal involving "pure questions of law that turn on undisputed facts"].)

'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that agreement to arbitrate is at issue." (*Concepcion, supra,* 563 U.S. at p. 339.)  In *Allied-Bruce Terminix Cos. v. Dobson* (1995) 513 U.S. 265, the Supreme Court held:  "What States may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause.  The Act makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal 'footing,' directly contrary to the Act's language and Congress' intent." (*Id.* at p. 281.)  The Supreme Court has explained that the saving clause "explicitly retains an external body of [state] law governing revocation." (*Arthur Andersen LLP v. Carlisle* (2009) 556 U.S. 624, 630.)  "'State law,' therefore, is applicable to determine which contracts are binding . . . and enforceable under" the FAA, "'*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.'" (*Arthur Anderson LLP,* at pp. 630-631.)

"Courts may not . . . invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." (*Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 687 (*Doctor's Associates*); see *Perry v. Thomas* (1987) 482 U.S. 483, 492, fn. 9 [the FAA preempts statute court decisions that take their "meaning precisely from the fact that a contract to arbitrate is at issue"].)  In *Doctors Associates,* the Supreme Court struck down a state law that impacted the enforceability of arbitration agreements by requiring "special notice" for arbitration provisions on the first page of contracts because the law "singl[ed] out arbitration provisions for suspect status." (*Doctor's*

45

*Associates,* at p. 687.)  In *Concepcion, supra,* 563 U.S. 333, the Supreme Court held that the FAA preempted the California rule that a contract's class-arbitration waiver was unenforceable because the rule "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives'" of the FAA. (*Concepcion*, at p. 352.)  The "defense [in *Concepcion*] failed to qualify for protection under the saving clause because it interfered with a fundamental attribute of arbitration . . . by effectively permitting any party in arbitration to demand class-wide proceedings despite the traditionally individualized and informal nature of arbitration." (*Epic Systems Corp. v. Lewis* (2018) ___ U.S. ___, ___, 138 S.Ct. 1612, 1622-1623.)  "In line with these principles courts must place arbitration agreements on an equal footing with other contracts, [citation], and enforce them according to their terms." (*Concepcion,* at p. 339.)  In *Concepcion,* the Supreme Court added that the FAA preempts even a "generally applicable" state law contract defense if that defense (1) is "applied in a fashion that disfavors arbitration" (*Id.* at p. 341), or (2) "interferes with fundamental attributes of arbitration" (*Id.* at p. 344), such as "'lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes.'" (*Id.* at p. 348.)

In *McGill v. Citibank*, *N.A.* (2017) 2 Cal.5th 945 (*McGill*), the California Supreme Court held that an arbitration provision was "invalid and unenforceable under state law insofar as it purports to waive" Civil Code section 3513's right to "public injunctive relief." (*McGill*, at p. 961.)  Rejecting the bank's argument that "precluding enforcement of the waiver" was "preempted by the FAA," the Supreme Court held that Civil Code section 3513 was a "generally applicable contract defense, i.e., it

46

[was] a ground under California law for revoking any contract." (*McGill,* at pp. 961-962.)  The Supreme Court explained:  "It is not a defense that applies only to arbitration or that derives its meaning from the fact that an agreement to arbitrate is at issue. . . . [A] provision in *any* contract–even a contract that has no arbitration provision–that purports to waive, in all fora, the statutory right to seek public injunctive relief under the [Unfair Competition Law], the [Consumer Legal Remedies Act], or the false advertising law is invalid and unenforceable under California law.  The FAA does not require enforcement of such a provision, in derogation of this generally applicable contract defense, merely because the provision has been inserted into an arbitration agreement.  To conclude otherwise would, contrary to Congress's intent, make arbitration agreements not merely 'as enforceable as other contracts, but . . . more so.'" (*McGill,* at p. 962.)

In *Mitchell v. American Fair Credit Assn., Inc.* (2002) 99 Cal.App.4th 1345 (*Mitchell*), the court held that the FAA did not preempt the California statutory requirement that consumers sign credit services agreements for the agreement to be effective. The court held, "the FAA does not preempt a neutral state law contract formation requirement simply because it can be applied to invalidate an arbitration agreement." (*Mitchell,* at p. 1357, fn. omitted.)  Although the statutory signature requirement only applied to credit services agreements, the court further held that the "signature requirement [was] a neutral contract principle" because "all contract provisions covered by [the statutory requirement] are subject to this formality" and "conditioning the enforcement of a contract on a party's signature . . . is certainly widespread in this state." (*Ibid.*)  The court in *Mitchell*

47

concluded: "Applying the [statute's] signature requirement to arbitration clauses does not reflect hostility to such provisions or interfere with any purpose of the FAA. Manifestly, we have not established a different set of requirements for enforcing a contract's 'basic terms (price, service, credit) . . . [and] its arbitration clause.' [Citation] Our interpretation . . . accords arbitration clauses an identical status with other clauses in original credit services agreements or agreements as modified and so is not preempted by the FAA." (*Mitchell,* at pp. 1359-1360, fn. omitted.)

Resolution of "issues regarding federal preemption involve[ ] questions of law which we independently review on appeal." (*Hood v. Santa Barbara Bank & Trust* (2006) 143 Cal.App.4th 526, 535; accord, *Washington Mutual Bank v. Superior Court* (2002) 95 Cal.App.4th 606, 612.)

### 2. *The FAA Does Not Preempt Section 11658*

As Travelers concedes, section 11658 does "not 'single out' arbitration agreements for unfavorable treatment." Section 11658's filing requirement enables the Commissioner to protect employers and employees by "closely scrutinizing" workers' compensation insurance plans. (*Jackpot Harvesting, supra*, 33 Cal.App.5th at p. 738.) Section 11658 requires that an insurer file with the Rating Bureau for the Commissioner's review not only the insurance policy, but also any endorsement, which purports to modify the insurance policy. Section 11658 is not concerned with arbitration or even dispute resolution. The filing requirement applies regardless of the endorsement's subject matter. Section 11658's filing requirement is a neutral contract formation requirement that is generally applicable to all provisions in any workers' compensation policy, endorsement, or

collateral agreement. Section 11658 is not a defense that applies only to arbitration or that derives its meaning from the fact that an agreement to arbitrate is at issue. Section 11658 does not prohibit arbitration; it only requires that an insurer file an arbitration provision, as any other endorsement, for the provision to be effective. Indeed, the Insurance Code does not prohibit arbitration under insurance contracts. (*Jackpot Harvesting,* at p. 736; see § 11658.5, subd. (a)(1).) By applying section 11658's filing requirement, there is no hostility to arbitration, and section 11658 is not being applied in a way that disfavors arbitration.

Because section 11658 imposed "a neutral state law contract formation requirement," section 11658 was not "an obstacle to the accomplishment of the FAA's objectives." (*Concepcion, supra,* 563 U.S. at p. 343.) Accordingly, the FAA did not preempt section 11658. (*Jackpot Harvesting, supra,* 33 Cal.App.5th at p. 736 ["'[section] 11658 does not even address arbitration or dispute resolution, and application of the FAA does not impair or supersede [section] 11658'"]; see *McGill, supra,* 2 Cal.5th at p. 964 [in *Concepcion,* the Supreme Court "*reaffirmed* that the 'saving clause permits agreements to arbitrate to be invalidated by "generally applicable contract defenses"' under *state* law"]; *Mitchell, supra,* 99 Cal.App.4th at p. 1357 ["the FAA does not preempt a neutral state law contract formation requirement simply because it can be applied to invalidate an arbitration agreement"].)

Travelers relies on *Bradley v. Harris Research, Inc.* (9th Cir. 2001) 275 F.3d 884 (*Bradley*) and *Ting v. AT&T* (9th Cir. 2003) 319 F.3d 1126 (*Ting*) to argue that, for a state law to be "saved" under section 2 of the FAA, the law must apply to "any contract." In *Bradley,* the Ninth Circuit held that a California

49

franchise statute, which specified where disputes could be resolved, was "not a generally applicable contract defense that applies to any contract, but only to forum selection clauses in franchise agreements." (*Id*. at pp. 890, 892.) Relying on *Bradley*, because the Consumer Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.) only applied to consumer and noncommercial contracts, the Ninth Circuit in *Ting* held that the FAA preempted the CLRA's anti-class action waiver provisions. (*Ting,* at p. 1148.) *Bradley* and *Ting* are distinguishable because they did not involve neutral contract formation requirements. (See *Mitchell, supra,* 99 Cal.App.4th at p. 1359.) Rather, the forum selection clause in *Bradley* and the anti-class action waiver in *Ting* interfered with arbitration.[14] Further, in declining to follow *Bradley* and *Ting,* the Ninth Circuit in *Sakkab v. Luxottica Retail North America, Inc.* (9th Cir. 2015) 803 F.3d 425 held that *Concepcion* "cuts against" *Ting* and *Bradley's* "construction of the saving clause." (*Sakkab*, at p. 433.) The Ninth Circuit added that the Supreme Court "appear[ed] to clarify" that the saving

---

[14]	In *Sanchez v. Valencia Holdings Co., LLC* (2015) 61 Cal.4th 899, the California Supreme Court held: "We conclude that the CLRA's anti-waiver provision is preempted insofar as it bars class waivers in arbitration agreements covered by the FAA. Sanchez's argument that enforcing the CLRA's anti-waiver provision merely puts arbitration agreements on an equal footing with other contracts is unavailing. *Concepcion* held that a state rule can be preempted not only when it facially discriminates against arbitration but also when it disfavors arbitration as applied. [Citation.] *Concepcion* further held that a state rule invalidating class waivers interferes with arbitration's fundamental attributes of speed and efficiency, and thus disfavors arbitration as a practical matter." (*Sanchez,* at p. 924.)

clause's "'any contract' language refers to whether a state law places arbitration agreements on equal footing with non-arbitration agreements, not whether it applies to all types of contracts." (*Id.* at p. 434, fn. 8; see *Epic Systems Corp. v. Lewis, supra,* \_\_\_ U.S. \_\_\_, \_\_\_, 138 S.Ct. 1622, ["[u]nder our precedent, this means the saving clause does not save defenses that target arbitration either by name or by more subtle methods, such as by 'interfer[ing] with fundamental attributes of arbitration'"]; *Kindred Nursing Centers Ltd. Partnership v. Clark* (2017) \_\_\_ U.S. \_\_\_, \_\_\_, 137 S.Ct. 1421, 1426 ["[t]he FAA thus preempts any state rule discriminating on its face against arbitration−for example, a 'law prohibit[ing] outright the arbitration of a particular type of claim.' [Citation.] And not only that: The Act also displaces any rule that covertly accomplishes the same objective by disfavoring contracts that (oh so coincidentally) have the defining features of arbitration agreements. In *Concepcion,* for example, we described a hypothetical state law declaring unenforceable any contract that 'disallow[ed] an ultimate disposition [of a dispute] by a jury'"].)

Here, the filing requirement in section 11658 is a neutral contract formation requirement. Applying section 11658's filing requirement to an arbitration endorsement does not reflect hostility to arbitration or interfere with any purpose of the FAA.[15]

---

[15] Given our conclusion that section 11658 falls within the FAA's saving clause, we do not reach Adir's argument that the FAA is subject to reverse preemption under the McCarran-Ferguson Act. (15 U.S.C. §§ 1011-1015.) (See *Citizens of Humanity, LLC v. Applied Underwriters, Inc., supra,* 17 Cal.App.5th at pp. 817-819.)

## DISPOSITION

The trial court's order dated August 23, 2018 is affirmed. Adir shall recover its costs on appeal.


DILLON, J.*


We concur:


PERLUSS, P. J.


FEUER, J.

---

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.